# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE                                    NEWS RELEASE #004

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **20th day of January, 2017**, are as follows:

**BY JOHNSON, C.J.**:

2016-O -0921        IN RE: JUDGE DARRYL A. DERBIGNY ORLEANS PARISH CRIMINAL DISTRICT COURT STATE OF LOUISIANA

Knoll, J., retired, participated in this decision which was argued prior to her retirement.

For the reasons assigned it is ordered that Judge Darryl A. Derbigny reimburse the Criminal Court Judicial Expense Fund $10,002.58.

JOHNSON, C.J., additionally concurs and assigns reasons.
WEIMER, J., concurs in part and dissents in part and assigns reasons.
GUIDRY, J., dissents and assigns reasons.
CLARK, J., concurs in the result.
HUGHES, J., dissents with reasons.
CRICHTON, J., concurs in part and dissents in part and assigns reasons.

SUPREME COURT OF LOUISIANA

No. 2016-O-0921

IN RE: JUDGE DARRYL A. DERBIGNY, ORLEANS PARISH
CRIMINAL DISTRICT COURT, STATE OF LOUISIANA

JUDICIARY COMMISSION OF LOUISIANA

**JOHNSON, Chief Justice**[*]

This matter arises from a recommendation of the Judiciary Commission of Louisiana ("Commission") that Judge Darryl Derbigny be publicly censured, ordered to reimburse the Orleans Parish Criminal District Court Judicial Expense Fund ("JEF") the amount of $57,359.96, and ordered to reimburse and pay to the Commission $8,150.24 in hard costs. The recommendation stems from Judge Derbigny's participation in the district court's supplemental insurance program and charges that he accepted insurance coverage and benefits beyond those allowed by law or available to all other court employees, the premiums for which were paid from the JEF. For the following reasons, we conclude the Office of Special Counsel ("OSC") has failed to prove by clear and convincing evidence that Judge Derbigny's participation in the district court's supplemental insurance program rises to the level of sanctionable misconduct under either the Code of Judicial Conduct or Article V, Section 25(C) of the Louisiana Constitution. However, we agree with the Commission that Judge Derbigny was not entitled to the benefits of any whole life insurance policies or the Exec-U-Care program under the plain language of La. R.S. 13:691. Because Judge Derbigny has already surrendered the cash value of the whole life policies to the JEF, we order him to reimburse the JEF $10,002.58, representing

---

[*] Knoll, J., retired, participated in this decision which was argued prior to her retirement.

the out-of-pocket reimbursements paid to Judge Derbigny under the Exec-U-Care program. Lastly, we decline the Commission's request to cast Judge Derbigny with hard costs incurred by the Commission.

## FACTS AND PROCEDURAL HISTORY

Judge Derbigny was elected to Section J of Orleans Parish Criminal District Court in 2003, and has served continuously since that time. The Commission began an investigation in January of 2012 following the broadcast of a series of news reports by New Orleans television station WWL-TV. The reports concerned the longstanding practice of the judges of the Orleans Parish Criminal District Court receiving extra insurance coverage paid for by the Criminal Court's JEF, beyond the standard medical insurance coverage available to all court employees at the employee's own cost.[2]

The Commission approved the filing of Formal Charge 0345 in March of 2015, alleging that Judge Derbigny committed ethical misconduct by choosing and accepting insurance coverage and program benefits beyond those authorized by law or available to all other court employees, the premiums and other costs of which were paid with money from the JEF. The charge alleged Judge Derbigny's acceptance and receipt of these benefits constitute supplemental income beyond what was permitted by law, and constituted a failure to diligently discharge his administrative responsibilities and was a misuse of public funds. The Formal Charge further alleged that Judge Derbigny's acceptance and receipt of these insurance coverages and program benefits resulted in multiple negative media reports concerning his court during a time when the court was experiencing budget problems

---

[2] An audit report issued by the Louisiana Legislative Auditor in November 2012 concluded in part that the judges of the Criminal District Court had improperly used public funds to provide themselves with supplemental and additional insurance benefits contrary to law.

2

and a negative Legislative Auditor's report, bringing his court and the judiciary as a whole into disrepute. The Formal Charge alleged that Judge Derbigny's conduct violated Canons 1 (a judge shall uphold the integrity and independence of the judiciary), 2A (a judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary), 2B (a judge shall not lend the prestige of judicial office to advance the private interest of the judge or others), and 3B(1) (a judge shall diligently discharge the judge's administrative responsibilities without bias or prejudice and maintain professional competence in judicial administration) of the Code of Judicial Conduct. The Formal Charge alleged that Judge Derbigny engaged in willful misconduct relating to his official duty, engaged in willful and persistent failure to perform his duties, and engaged in persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute, in violation of La. Const. art. V, § 25(C).[3]

A hearing officer was appointed and convened a hearing from September 21-23, 2015. Following the hearing, the Hearing Officer filed a report with the Commission containing proposed findings of fact and conclusions of law. Thereafter, the Commission established a briefing schedule and ordered Judge Derbigny to appear on February 26, 2016, for questioning by the Commissioners.

---

[3] La. Const. art. V, § 25(C) provides: "On recommendation of the judiciary commission, the supreme court may censure, suspend with or without salary, remove from office, or retire involuntarily a judge for willful misconduct relating to his official duty, willful and persistent failure to perform his duty, persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, conduct while in office which would constitute a felony, or conviction of a felony. On recommendation of the judiciary commission, the supreme court may disqualify a judge from exercising any judicial function, without loss of salary, during pendency of proceedings in the supreme court. On recommendation of the judiciary commission, the supreme court may retire involuntarily a judge for disability that seriously interferes with the performance of his duties and that is or is likely to become permanent. The supreme court shall make rules implementing this Section and providing for confidentiality and privilege of commission proceedings."

3

We adopt many of the Commission's Findings of Fact, summarized below.

From 2006 to 2011,[4] the JEF made payments on policies covering Judge Derbigny, including three long-term care policies, two life insurance policies, and a comprehensive policy covering a variety of specialized insurance categories, including term and universal life, critical illness, accidental death and dismemberment (AD&D), and cancer, heart, and ICU coverages.[5] In addition, the

---

[4] Records maintained by Criminal District Court covering the period prior to 2006 were destroyed in Hurricane Katrina; therefore, only the 2006 to 2011 time frame is at issue here.

[5] <u>Long-Term Care policies</u>
- Conseco/Washington National, January 1, 2006 to October 17, 2011
- Transamerica GB-5001024, April 29, 2010 to October 4, 2011
- Transamerica GB-5001042, January 17, 2006 to October 4, 2011

<u>Life Insurance policies</u>
- Mutual of Omaha, June 1, 2007 to October 3, 2011
- Sun Life, March 5, 2010 to October 3, 2011
- Transamerica OR-166 (term life), January 5, 2009 to November 29, 2011
- Transamerica OR-166 (universal life), November 30, 2009 to October 25, 2011

<u>Critical Illness policies</u>
- Transamerica OR-166, January 26, 2006 to November 25, 2008
- Transamerica OR-166, November 30, 2009 to November 29, 2011

<u>AD&D policies</u>
- Mutual of Omaha, June 1, 2007 to October 3, 2011
- Transamerica OR-166, January 26, 2006 to November 29, 2011

<u>Cancer/Wellness/ICU/Heart policy</u>
- Transamerica OR-166, January 26, 2006 to November 29, 2011

package of supplemental insurance policies included "Exec-U-Care," an insurance reimbursement program that reimbursed participants for co-payments or any other out-of-pocket health expenses not covered by traditional health insurance or the supplemental benefits program. Judge Derbigny held the Exec-U-Care policy from January 5, 2006 to April 4, 2012. Two of the life insurance policies held by Judge Derbigny, Transamerica and Sun Life, had a cash surrender value. Upon cancellation of those policies, Judge Derbigny received checks representing the cash surrender value of both policies. He then endorsed both checks over to the JEF.[6] The undisputed costs of these extra insurance coverages and program benefits relative to Judge Derbigny totaled $57,359.96, including $12,727.86 expended for the Exec-U-Care program.

The supplemental insurance program instituted by the judges of the Criminal District Court predated Judge Derbigny by at least twenty, and possibly thirty years. Judge James McKay, currently a judge of the Fourth Circuit Court of Appeal, was a judge at Criminal District Court from 1982 to approximately 1997. Judge McKay testified that the program began sometime in the late 1980's or early 1990's. Although some parts of the supplemental insurance program have changed since the inception of the program, key elements have remained the same, including but not limited to the use of the JEF and the availability of policies not offered to other court employees.          In 1994, the Commission conducted an investigation of Criminal District Court's supplemental insurance program. In June 1994, then-Special

_Hospital Select policy_
- Transamerica OR-166, January 26, 2006 to November 29, 2011

[6] The cash surrender value of the Transamerica Life policy was $97.39; the cash surrender value of the Sun Life policy was $6,314.76.

Counsel, Steven Scheckman, sent a subpoena requesting documents related to the program to the judges of Criminal District Court. He also requested a response about the legality of the program from the judges of Criminal District Court en banc. Robert Murphy, who is now a judge of the Fifth Circuit Court of Appeal, represented the judges of Criminal District Court in connection with the Commission's investigation of the supplemental insurance program. Mr. Murphy gave the judges "positive advice that what they were trying to accomplish was appropriate" and that "they were not going to run afoul of the Judiciary Commission for doing what they wanted to do."

At the end of the Commission's deliberations on the matter, Mr. Scheckman was directed to write a letter to Judge Jerome Winsberg, then the chief judge of Criminal District Court. Mr. Murphy, as the judges' attorney, was provided a copy of the letter. The August 25, 1994, letter stated that the Commission "determined that there was no judicial misconduct involving the purchase of insurance for judges...." The letter further expressed the Commission's concern that the practice of purchasing additional insurance "may violate the original intent of the judicial parity statute, R.S. 13:691...," and stated that the matter would be referred to the Judicial Council for further deliberation. The letter also noted an issue of "serious" concern to the Commission - the existence of a cash surrender value for some of the policies. To address this concern, the Commission requested written verification the judges had eliminated policies with a cash surrender value.

The minutes of an August 1, 1994 en banc meeting of the Criminal Court judges reveal the following motions were made, seconded, and passed unanimously: that the cash value of any policy be directed to the JEF, and that all policies be transferred to the JEF as owner. On October 6, 1994, Mr. Scheckman wrote Mr. Murphy thanking him for his "recent submissions" and stating further that he would

6

now be closing out his file. According to Mr. Scheckman's testimony in the instant matter, the Commission would have made the decision to close out the file and thus it was reasonable to conclude that the documents sent by Mr. Murphy had satisfied the Commission's concerns.

Regarding the Commission's referral to the Judicial Council, Mr. Scheckman testified that the Commission "didn't consider it an ethical violation, .... It was a legitimate policy issue. ... And they wanted a resolution to that by the Judicial Council, which is, in effect, the policymaking arm of the Supreme Court ...." Based on his own personal knowledge, Mr. Scheckman testified that, despite the Commission's referral, the Council did not address the policy questions posed. Dr. Hugh Collins, the former Judicial Administrator of the Supreme Court, could not remember if the Commission referred the issue to the Judicial Council. Other witnesses also did not know whether the Judicial Council had taken any action, including Robert Murphy, Judge Winsberg, Judge Calvin Johnson, and Judge McKay. Judge McKay stated that, had the Judicial Council acted on the issue, "the whole judiciary would have been made aware."

Newly-elected judges at Criminal District Court were enrolled in the supplemental benefits program by the Judicial Administrator of Criminal District Court. Robert Kazik, the Judicial Administrator since 2006, testified that when the new judges "showed up, we gave them a packet and said fill this out, it's your new-hire paperwork ... just like any other employee." Mr. Kazik's predecessor, Elizabeth Stogner, testified that she would enroll the judges in the supplemental benefits program, including dental, vision, life insurance, and Exec-U-Care. The Hearing Officer asked Ms. Stogner whether all of the judges availed themselves of all available policies. Ms. Stogner replied that the judges signed up for "all policies" unless a particular judge was not eligible for a certain policy due to health reasons.

7

Judge Derbigny recalled signing up for insurance benefits when he joined the court in 2003, but he characterized it as perfunctory. He stated he was summoned to the Judicial Administrator's Office:

> where I was presented, in my vague recollection, with a packet of materials, that this is – sign here, sign there, these are all part of your benefits that you are the beneficiary as a result of your election, congratulations, sign off on the dotted line and go to work. ... It just seemed to me to be part of the process of signing on as a new employee of the court.

After 2006, Judge Derbigny recalled being summoned to the Judicial Administrator's Office to sign paperwork regarding additional policies. He acknowledged that some of the supplemental insurance policies provided duplicative and overlapping coverage, but explained that once the situation was realized by the Judicial Administrator the judges took action and eliminated the duplicative policies. During his appearance before the Commission, Judge Derbigny reiterated that he completely relied on others to vet the legality and ethical propriety of the supplemental insurance benefits, including his predecessors in office, his colleagues, the insurance committee, and the chief judge.

In June 2011, the court received a public records request regarding the supplemental benefits program from a reporter at WWL-TV. Upon receiving the request, Judge Julian Parker, then the chief judge, requested that the judges retain counsel to examine the legality of the program and to respond to the public records request. The judges agreed and retained Mr. Normand Pizza. Although Mr. Pizza ultimately concluded the program was legal, the judges collectively decided to cancel their policies and to suspend the filing of any claims in the Exec-U-Care program. Judge Derbigny's cancellation letter, dated November 8, 2011, was

8

prepared by the court's human relations specialist and signed by Judge Derbigny.[5]

The Commission found that Judge Derbigny's acceptance of this large number of supplemental benefits at no cost to himself was ethically improper and constituted a violation of the Code of Judicial Conduct and the Louisiana Constitution. Specifically, the Commission found that Judge Derbigny violated Canons 1, 2A, and 3B(1) of the Code of Judicial Conduct.[6] The Commission further concluded that Judge Derbigny engaged in persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute, in violation of La. Const. art. V, § 25(C). Judge Derbigny's participation in the supplemental benefits program over a period of at least five years diverted thousands of dollars from the administration of justice, and generated negative publicity for the judicial office. However, the Commission also noted his conduct was significantly mitigated by the inaction of the Judicial Council and others who failed to properly advise the Criminal District Court judges about the legality of the supplemental benefits program. Because there was no evidence presented that Judge Derbigny engaged in any intentional or willful conduct, the Commission did not find that he engaged in willful misconduct relating to his official duty, or engaged in willful and persistent failure to perform his duties. Thus the Commission recommended that Judge Derbigny be publicly censured, ordered to reimburse JEF the amount of $57,359.96,[7]

---

[5] Judge Derbigny did not cancel Exec-U-Care until April 2012; however, the Commission made no finding that Judge Derbigny made any claim under this program after November 2011.

[6] The Commission did not find a violation of Canon 2B, as there was no evidence presented that Judge Derbigny used the prestige of his judicial office to receive supplemental benefits.

[7] The total amount expended by the JEF on supplemental benefits for Judge Derbigny was $57,359.96, broken down as follows:

- Conseco/Washington National: $5,566.29
- Transamerica GB-5001024: $2,821.72
- Transamerica GB-5001042: $10,222.36
- Mutual of Omaha: $1,656.00
- Sun Life: $8,277.57
- Transamerica OR-166: $16,088.16

and ordered to reimburse and pay to the Commission $8,150.24 in hard costs.

## DISCUSSION

This court is vested with exclusive original jurisdiction in judicial disciplinary proceedings by La. Const. art. V, § 25(C). This court makes determinations of fact based on the evidence in the record and is not bound by, nor required to give any weight to, the findings and recommendations of the Judiciary Commission. *In re Quirk*, 97-1143 (La. 12/12/97), 705 So. 2d 172, 176. In addition to the substantive grounds for disciplinary action listed in the Louisiana Constitution, this court, in accordance with its supervisory authority over all lower courts, has adopted the Code of Judicial Conduct, which is binding on all judges and violations of the Canons contained therein may serve as a basis for the disciplinary action provided for by La. Const. art. V, § 25(C). *Id.* The standard of proof in judicial discipline cases is the clear and convincing standard. *In re Chaisson*, 549 So. 2d 259, 263 (La. 1989). Under this standard, the level of proof must be more than a mere preponderance of the evidence but less than beyond a reasonable doubt. *In re Huckaby*, 95-0041 (La. 5/22/95), 656 So. 2d 292, 296.

Having reviewed the record, we conclude the OSC failed to prove by clear and convincing evidence that Judge Derbigny's participation in the court's supplemental insurance program rose to the level of sanctionable misconduct under either the Code of Judicial Conduct or Article V, § 25(C) of the Louisiana Constitution.

The Commission found the use of JEF funds to purchase long-term care, critical illness, accidental death and dismemberment, cancer/wellness/ICU/heart,

---

- Exec-U-Care: $12,727.86, which consisted of $10,002.58 in out-of-pocket reimbursements to Judge Derbigny, $1,625.00 in premiums, and $1,100.28 in administrative fees.

10

and hospital select portion of the court's supplemental benefits program was authorized by law and not in violation of La. R.S. 13:691, 42:851, or 13:1381.4. La. R.S. 13:691, the judicial parity statute, provides that a judge shall not receive "any additional salary, compensation, emolument, or benefit" for his services as a judge, ... except "(3) Payment of premiums for health, medical, dental, and hospitalization insurance programs contributions to which shall be at the same rate as those paid by other state employees." The statute does not limit a judge to receipt of benefits offered to state employees. Rather, a judge may receive a payment of premiums for health, medical, dental, and hospitalization insurance programs, as long those payments are at the same rate as those paid by other state employees, without violating the statute. The Commission recognized, however, that La. R.S. 13:691 refers only to the health, medical, dental, and hospitalization portions of the supplemental insurance program. Thus, the Commission noted the statute does not explicitly authorize payments relative to life insurance or insurance reimbursement programs such as Exec-U-Care.

Additionally, the Commission concluded the supplemental benefits program did not violate La. R.S. 42:851.[8] That statute would require the court to seek approval

---

[8] La. R.S. 42:851 provides in pertinent part as follows:

A. The state of Louisiana, through the Office of Group Benefits and each of its governmental and administrative subdivisions, departments, or agencies of the executive, legislative, or judicial branches, ... are authorized to:

(1) Procure private contracts of insurance covering their respective employees, officials, and department heads, or any class or classes thereof, and the dependents of such employees, officials, or department heads under a policy or policies of group health, accident, accidental death and dismemberment, and hospital, surgical, or medical expense benefits. ...

B. Each such private contract or self-funded program, the premiums of which are paid in whole or in part with state funds, shall be approved by the Office of Group Benefits, except that any city or parish school board may enter into such private contract or self-funded program without approval. The employee or retiree eligibility provided in such private contract or self-funded program must be identical to the eligibility provided in the Office of Group Benefits programs.

11

from the Office of Group Benefits to contract for these supplemental benefits, but only if premiums are paid "in whole or in part with state funds." Here, the premiums for the supplemental benefits program were paid by the JEF. These funds are not state funds within the meaning of La. R.S. 42:851. *See Dejoie v. Medley*, 08-2223 (La. 5/5/09), 9 So. 3d 826.

The Commission also considered La. R.S. 13:1381.4, the statute authorizing the JEF, which prohibits the payment of salary from the fund to any judges of the court.[9] However, the Commission found that because Section (D) of the statute uses the specific term "salary" instead of the more general term "compensation," it does not refer to the long-term care, critical illness, AD&D, cancer/wellness/ICU, or hospital select portions of the supplemental benefits program.

---

[9] La. R.S. 13:1381.4 provides:

A. (1) In all criminal cases over which the Criminal District Court for Orleans Parish has original, appellate, supervisory, or concurrent jurisdiction, including traffic violations other than parking, there shall be taxed as costs against every defendant who is convicted after trial or plea of guilty or nolo contendere or who forfeits his bond the sum of five dollars, which shall be in addition to all other fines, costs, or forfeitures lawfully imposed and which shall be transmitted to the judicial administrator of the Criminal District Court for Orleans Parish for further disposition in accordance herewith.

(2) In addition to all other fines, costs, or forfeitures lawfully imposed by this Section or any other provision, the court may impose an additional cost against any defendant who has been finally convicted of a misdemeanor, excluding traffic violations, or a felony. The additional costs authorized in this Paragraph shall not exceed five hundred dollars in the case of a misdemeanor nor exceed two thousand five hundred dollars in the case of a felony. All such sums collected shall be transmitted to the judicial administrator for further disposition in accordance herewith.

B. The judicial administrator of the Criminal District Court for Orleans Parish shall place all sums collected or received under this Section in a separate account to be designated as the judicial expense fund for the Criminal District Court for Orleans Parish. The judges of the court shall cause to be conducted annually an audit of the fund and the books and accounts relating thereto and shall file the same with the office of the legislative auditor where it shall be available for public inspection.

C. The judicial expense fund is established and may be used for any purpose connected with, incidental to, or related to the proper administration or function of the court or the office of the judges thereof and is in addition to any and all other funds, salaries, expenses, or other monies that are provided, authorized, or established by law.

D. No salary shall be paid from the judicial expense fund to any judges of the court.

12

Despite these findings, the Commission found the OSC had proven by clear and convincing evidence that respondent violated Canons 1, 2A, and 3B(1). Although we agree with the Commission's interpretation and application of the relevant statutes relative to the legal propriety of the supplemental insurance benefits under review in this case, we disagree with the Commission's ultimate conclusion that the OSC proved a violation of the Code of Judicial Conduct by clear and convincing evidence.

Canon 1, entitled "A Judge Should Uphold the Integrity and Independence of the Judiciary," provides:

> An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective. As a necessary corollary, the judge must be protected in the exercise of judicial independence.

Part A of Canon 2 of the Code entitled, "A Judge Should Avoid Impropriety and the Appearance of Impropriety in All Activities," states:

> A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

Part B of Canon 3 of the Code, entitled "Administrative Responsibilities," provides in pertinent part in Paragraph (1):

> A judge shall diligently discharge the judge's administrative responsibilities without bias or prejudice and maintain professional competence in judicial administration....

We find the OSC failed to prove that Judge Derbigny did not maintain professional competence in the administration of his court and did not uphold the integrity of his court under the facts of this case.

First, although the Commission cited to the "large number" of supplemental benefits accepted by Judge Derbigny, there is no prohibition or limitation in La. R.S.

13

13:691(B) in either the number of policies or the costs of the supplemental insurance program, as long as those polices otherwise comply with the law. There is no showing by the OSC in this record that the insurance premiums attributed to Judge Derbigny exceeded those of any other judges or state employees. Similarly, there was nothing in the expense reports provided to the judges that would have caused Judge Derbigny or others to question the benefits offered. Further, the record establishes that once the duplicative coverages were pointed out to him, Judge Derbigny took appropriate action to cancel the duplicative policies.

Additionally, while we agree with the Commission that the life insurance policies and expense reimbursement policies, such as Exec-U-Care, are not specifically referenced in La. R.S. 13:691, we do not find clear and convincing evidence that Judge Derbigny failed to maintain professional competence in the administration of the court with regard to these policies. As the Commission and the Hearing Officer reiterated, the supplemental benefits program at issue preceded Judge Derbigny's election to the court by at least twenty years, and the history of that program was muddled at best. Based on the record and testimony, it is apparent that a multitude of elected judges have benefitted from these same supplemental benefits over perhaps thirty years. There was no evidence that Judge Derbigny knew of potential irregularities or participated in the procurement of the policies. Pursuant to the 1994 letter from the Special Counsel to the judges of the court, life insurance policies with cash surrender values should not have been obtained by the court, but the Commission agreed Judge Derbigny would not have been aware of the Commission's prior admonition to the court. Instead, the record supports the Commission's finding that new judges were presented with information about the supplemental benefits, including these life insurance policies, along with the regular group benefits, and that this presentation gave the appearance that the supplemental

14

benefits were a part of an overall benefits package given to every judge, and otherwise gave the indication to Judge Derbigny that the benefits were legal and fully vetted by his colleagues and predecessors.

With regard to the term life insurance policies and the Exec-U-Care program, the Commission cited testimony in the record that the supplemental insurance program it had investigated in 1994 was substantially similar to the supplemental insurance program in which Judge Derbigny participated between 2006 and 2011. Although the OSC argues the record is not clear that these policies were included in the program in effect in 1994, we find sufficient evidence in the record to conclude otherwise. Bryan Wagner, an independent insurance agent, testified that he sold numerous insurance policies to the Criminal District Court judges beginning in the early 1990's, including group life insurance policies. He also recalled selling the judges the Exec-U-Care program beginning in 2006, although he could not recall whether other medical reimbursement polices, such as Exec-U-Care, were in effect prior to 2006. Robert Kazik, the Judicial Administrator of Criminal District Court since 2006, also testified regarding his knowledge of the supplemental benefits program. Mr. Kazik has been employed at Criminal District Court for more than 26 years and testified the supplemental policies, including an Exec-U-Care type policy, came into existence in the early 1990's. Elizabeth Stogner, Judicial Administrator of the Criminal District Court from 2000 to 2006, testified she enrolled the judges in these policies, including Exec-U-Care, during her term as Judicial Administrator, although she could not recall when the court approved the supplemental policies. Former Criminal District Court Judge McKay testified the supplemental insurance program went into effect in the late 1980's or early 1990's and Exec-U-Care was part of the supplemental insurance program in 1994 (when the program was investigated by the Judiciary Commission). Judge Camille Buras, elected as a Criminal District

Court judge in 1998, testified she was aware the judges before her had the same supplemental benefits, including Exec-U-Care. Finally, Steve Scheckman, Special Counsel for the Judiciary Commission from 1994 to 2008, testified that the supplemental insurance program in 1994 included substantially the same policies offered by the program under review in this matter. He further testified the benefits program in 1994 included the same type of expense reimbursement policy providing the same coverage as the Exec-U-Care policy, although he was not sure if it was called "Exec-U-Care."

The Judiciary Commission in 1994 determined there was no judicial misconduct relative to the payment for these supplemental benefits for the judges. The only differentiation was with regard to life insurance policies with cash surrender values. We are hard-pressed to discern the reasoning behind the Commission's current reversal of its view in 1994 that the judges had not engaged in any judicial misconduct by participating in the supplemental benefits program, but that Judge Derbigny, who was elected to the bench in 2003, has committed judicial misconduct by participating in substantially the same supplemental benefits program. There is no dispute that JEF funds are no longer used to pay for the judges' supplemental insurance policies. And, going forward, our ruling makes clear that a judge's acceptance of these particular benefits would not be authorized by La. R.S. 13:691. However, based on the particular facts of this case, we decline to find Judge Derbigny's acceptance of these benefits in the past to be an ethical violation. The record clearly establishes that the supplemental benefits program investigated in 1994 included both life insurance policies and a medical expense reimbursement program, such as the Exec-U-Care program. The OSC found no misconduct relative to term life insurance policies or the Exec-U-Care benefits, and singled out only life insurance polices with cash surrender values as an item of concern. Judge Derbigny's

16

actions, viewed in light of the OSC's prior investigation and findings, do not constitute ethical misconduct.

Furthermore, although a judge cannot simply rely on others, such as his judicial predecessors or his administrative staff, to have vetted the insurance policies he was offered, we do not find that Judge Derbigny "wholly abdicated his ethical responsibilities" with regard to the supplemental insurance benefits at issue. The Commission found that Judge Derbigny violated the Code of Judicial Conduct and the Louisiana Constitution by his "over reliance" on his predecessors and court administrative personal. However, the record contains no indication that Judge Derbigny was ever put on notice prior to 2011 that the supplemental benefits program was legally or ethically improper. The program that Judge Derbigny joined in 2003 had been in place for at least 20 years. Even if he had made his own inquiry into the propriety of the criminal court's supplemental insurance benefits program, he would have found no indication of disapproval of the program by the Commission (other than the cash value policies), the Judicial Council, or any other authority. The record shows that following its investigation of the program in 1994, neither the OSC nor the Commission addressed the issue of the criminal court's supplemental insurance program again until 2011, when it commenced the instant proceedings. The OSC has not made a showing that Judge Derbigny knew or should have known that his participation in the criminal court's supplemental benefits program was not both legal and ethically permissible. The Commission agreed with Judge Derbigny that his level of culpability in this matter is greatly diminished by his lack of guidance from the judicial branch and by the actions of his predecessors. Under the particular circumstances of this case, especially the scope and convoluted history of the criminal court's supplemental benefits program – a history the Commission itself recognized as "complicated," along with the Commission's shifting viewpoints on

17

the propriety of parts of the program, we conclude the OSC failed to show that Judge Derbigny's conduct rose to the level of a violation of the Code of Judicial Conduct or that he violated La. Const. art. V, § 25(C) by engaging in persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute.

Nevertheless, while we do not find that Judge Derbigny's conduct rose to the level of a violation of the Code of Judicial Conduct, we ultimately agree with the Commission that La. R.S. 13:691(B) by its very language does not reference life insurance policies or the type of reimbursement program offered under the Exec-U-Care program. While Judge Derbigny argues that the Exec-U-Care program was a medical benefits program, we agree with the Commission that the program was not "insurance," but was instead a program to reimburse participants for out-of-pocket medical and dental expenses. Accordingly, we order Judge Derbigny to reimburse the JEF $10,002.58 in out-of-pocket reimbursements to Judge Derbigny.[10] Because the Commission in 1994 found no judicial misconduct for participating in such a program, we decline to cast Judge Derbigny for the premiums and administrative fees paid to Exec-U-Care.

## CONCLUSION

In sum, we conclude the Office of Special Counsel has failed to prove by clear and convincing evidence that Judge Derbigny's participation in the criminal district court's supplemental insurance program rose to the level of sanctionable misconduct under either the Code of Judicial Conduct or Article V, § 25(C) of the Louisiana Constitution. However, we find the plain language of La. R.S. 13:691 does not reference either life insurance or a reimbursement program as provided by the

---

[10] *See In re Granier*, 04-3031 (La. 6/29/05), 906 So. 2d 417, 420.

Exec-U-Care policy, and thus such policies were not authorized by law. Judge Derbigny has surrendered to the JEF the cash value of the whole life insurance policies. Accordingly, we order him to reimburse the JEF $10,002.58, representing the out-of-pocket reimbursements paid to Judge Derbigny under the Exec-U-Care program. Because we find no sanctionable misconduct on the part of Judge Derbigny, we decline the Commission's request to cast Judge Derbigny with hard costs incurred by the Commission.

## DECREE

For the reasons assigned, it is ordered that Judge Darryl A. Derbigny reimburse the Criminal Court Judicial Expense Fund $10,002.58.

**SUPREME COURT OF LOUISIANA**

**No. 2016-O-0921**

**IN RE: JUDGE DARRYL A. DERBIGNY, ORLEANS PARISH CRIMINAL DISTRICT COURT, STATE OF LOUISIANA**

**JUDICIARY COMMISSION OF LOUISIANA**

**JOHNSON, Chief Justice, additionally concurs**

I write separately in this matter to reiterate that our decision necessarily takes into account the convoluted and established history of the supplemental benefits program in Criminal District Court. In finding Judge Derbigny committed ethical misconduct, one of my dissenting colleagues fails to appreciate the relevance of this history by discounting the standard and accepted practice of the court providing such benefits for its judges.

As set forth in detail in the majority opinion, this longstanding supplemental benefits program existed for thirty years, long before Judge Derbigny was elected. The Judiciary Commission investigated the judges' participation in this program in 1994, following which the program was not declared illegal or improper and the Commission declined to impose any discipline. Despite these facts, one of the dissenters declares that Judge Derbigny "must now account for his own role" in the system and suggests Judge Derbigny should be sanctioned. In my view, to demonize this one particular judge when scores of other judges have participated and benefitted from the same program over thirty years is patently unfair.

For the reasons explained in the majority program, I find Judge Derbigny's actions did not rise to the level of sanctionable misconduct.

01/20/17

# SUPREME COURT OF LOUISIANA

## NO. 2016-O-0921

### IN RE: JUDGE DARRYL A. DERBIGNY,
### ORLEANS PARISH CRIMINAL DISTRICT COURT,
### STATE OF LOUISIANA

*JUDICIARY COMMISSION OF LOUISIANA*

**WEIMER, J.**, concurring in part and dissenting in part.

This entire matter is disappointing on many levels–beginning with the implementation of the supplemental benefits program, through the Judiciary Commission[1] evaluation of the judges' participation in the program in 1994, and ending with the lack of contemporary follow-up by the then Judicial Council[2] at the time the program was initially uncovered. The presiding hearing officer, retired Judge Ward Fontenot, referred to this matter as having a "somewhat troubling" history. The current Judiciary Commission described the program as creating the public impression of the "pilfering [of] court funds" at the expense of the public. Judiciary Commission's Findings of Fact, Conclusions of Law, and Recommendation of Discipline, Case No. 0345, p. 38.

---

[1] The [Judiciary] Commission consists of nine members ...: one court of appeal judge and two district judges ...; two attorneys admitted to the practice of law for at least ten years and one attorney admitted to the practice of law for at least three but not more than ten years ...; and three citizens, not lawyers, judges or public officials ....

http://www.lasc.org/la_judicial_entities/judiciary_commission.asp (last visited 12/12/16). Under La. Const. art. V, § 25(C), the Judiciary Commission initiates procedures for judicial discipline by recommendation to the Louisiana Supreme Court. In a typical case, the Judiciary Commission makes such recommendations after initiating investigations, hearings, and making its own factual and legal determinations. See generally JCL Rules VI, VII, VIII, and XI(C)(3)(b).

[2] "[T]he Judicial Council serves as a research arm for the Supreme Court. It often acts as a resource center where ideas for simplifying and expediting judicial procedures and/or correcting shortcomings in the system are studied." http://www.lasc.org/la_judicial_entities/judicial_council.asp (last visited 12/12/16).

Public officials are elected to serve, not to be served by taking advantage of the public fisc. Those who created the so-called employee benefits system for the Orleans Parish Criminal Court are not presently before this court. However, Judge Derbigny, who was lured into the system as a new judge, must now account for his own role. Whether others who may or may not be more culpable than Judge Derbigny will be brought before this court is for the Judiciary Commission to decide. See La. Const. art. V, § 25(C); see also **Small v. Guste**, 383 So.2d 1011, 1013 (La. 1980) (ruling that this court's disciplinary authority over judges may be initiated "solely by exercise of this Court's exclusive original jurisdiction on Judiciary Commission recommendation."). Obviously, each matter must be decided on its own facts.

Judge Derbigny's role, initially, like that of virtually every employee new to a job, involved the mere signing of benefits forms presented to him. In his initial role, Judge Derbigny no doubt perfunctorily relied on those who preceded him and those responsible for administration of the benefits system. Robert Kazik, the Judicial Administrator since 2006, testified when the new judges "showed up, we gave them a packet and said fill this out, it's your new-hire paperwork ... just like any other employee." Mr. Kazik's predecessor, Elizabeth Stogner, testified she would enroll the judges in the supplemental benefits program, including dental, vision, life insurance, and Exec-U-Care. When asked whether all of the judges availed themselves of all available policies, Ms. Stogner replied that the judges signed up for "all policies" unless a particular judge was not eligible for a certain policy for health reasons.

However, Judge Derbigny continued to add and accept supplemental benefits throughout his tenure on the bench until 2011, which was proximate in time to an

2

audit of the benefits system conducted by the Louisiana Legislative Auditor. A majority of this court now finds that Judge Derbigny committed no judicial misconduct in his continued utilization of the benefits system. I respectfully disagree.

There were several types of insurance policies that Judge Derbigny obtained. Some were whole life insurance policies, with a cash surrender value, which were essentially the same policies as those investigated by the Judiciary Commission in 1994 and found at that time to have been inconsistent with La. R.S. 13:691. The majority does not find misconduct in Judge Derbigny's continued procurement of the whole life policies, essentially because the Judiciary Commission found no judicial misconduct in 1994 for procuring whole life policies. At the time, the Judiciary Commission explained that, while it found no judicial misconduct, the practice of buying whole life insurance policies "may violate the original intent of the judicial salary parity statute, La. R.S. 13:691." See August 25, 1994 letter of the Office of Special Counsel for the Judiciary Commission (p. 3971 of the record of these proceedings).

I accept Judge Derbigny's representations that he was unaware of the Judiciary Commission's opinion from 1994. However, his unawareness of the 1994 opinion does not relieve Judge Derbigny from knowing the law. Citizens without training in the law are not excused from not knowing the law. See La. C.C. art. 5 ("No one may avail himself of ignorance of the law."). Judge Derbigny is a judicial officer and has extensive training in the law. Other court employees who were not judges could not obtain the whole life insurance policies on the same favorable payment terms as did Judge Derbigny. Moreover, Judge Derbigny could have eventually personally benefitted from policies paid for with public funds when the policies

3

reached a maturity date or were surrendered. His conduct in obtaining the whole life insurance policies, therefore, violated La. R.S. 13:691(A) and (B)(3).[3] Such a violation of statutory law by a judge, in the course of his official duties, amounts to ethical misconduct. See **In re Lemoine**, 96-2116, p. 2 (La. 4/4/97), 692 So.2d 358, 359 (on reh'g).[4]

A similar analysis applies to the other so-called employee benefits at issue, inasmuch as they were not authorized by statute. The majority of this court concedes that the Exec-U-Care program is not insurance authorized by La. R.S. 13:691 and, consequently, the majority "order[s] Judge Derbigny to reimburse the JEF $10,002.58 in out-of-pocket reimbursements to Judge Derbigny." **In re Derbigny**, 16-0921, slip op. at 17 (La. 12/___/16).

As the Judiciary Commission correctly indicates, the Exec-U-Care product "is not insurance. ... Under the Exec-U-Care program, ... the Criminal Court [Judicial Expense Fund] paid not only for premiums on Judge Derbigny's behalf but also paid for the actual amounts Judge Derbigny was reimbursed" for out-of-pocket expenses such as medical co-pays. Judiciary Commission's Findings of Fact, Conclusions of Law, and Recommendation of Discipline, Case No. 0345, p. 31 n.42. True insurance involves a risk to the underwriter, but this was nothing more than a

---

[3] The referenced provisions of La. R.S. 13:691(A) and (B)(3) prohibit judges from receiving "any additional salary, compensation, emolument, or benefit" not authorized by law, and prohibit judges from benefitting from any "[p]ayment of premiums for ... insurance programs" unless the payment is "at the same rate as those paid by other state employees."

[4] In **In re Lemoine**, 96-2116 at 2, 692 So.2d at 359, this court ruled that a failure to recuse, when statutory grounds exist, was sanctionable misconduct. The court explained:

> A judge's clear violation of a statute is misconduct, *because it is a judge violating the law*, and such disobedience or disrespect for the law, which his very oath commands that he support, constitutes "willful misconduct relating to his official duty," under Art. V, § 25(C) of the Constitution. Such a statutory violation would also constitute an ethical breach under Canon 2 of the Code of Judicial Conduct.

ruse–masquerading as insurance–to reimburse the judges' out-of-pocket expenses not covered by the judges' true insurance coverages. Furthermore, because the Exec-U-Care program charged "administrative fees" for paying Judge Derbigny's out-of-pocket expenses, the Judicial Expense Fund was actually paying more than if it had paid Judge Derbigny's expenses directly. This program was not available to other court employees who were not judges.

Given the manner in which La. R.S. 13:691 addresses benefits to judges, it has been described in this litigation as "the judicial salary parity statute."[5] In that regard, the statute prohibits judges from receiving benefits not made available to other employees and requires judges to pay the same as non-judges for the benefits judges receive. See La. R.S. 13:691(A) and (B)(3). The Exec-U-Care program violated both principles. Because Judge Derbigny violated statutory law in accessing the Exec-U-Care program, he has committed ethical misconduct. See **In re Lemoine**, 96-2116 at 2, 692 So.2d at 359 (on rehg).

In my view, the determination that Judge Derbigny violated statutory law,[6] but did not engage in ethical misconduct departs from the well-established proposition that a judge's significant violation of statutory law in the course of his official duties amounts to ethical misconduct (see *id.*), as well as the jurisdictional

---

[5] The statute could also be referred to as a limitation on judicial compensation and benefits, in my view.

[6] As stated by the majority, "it is clear that acceptance of these particular benefits is not authorized by La. R.S. 13:691." **In re Derbigny**, 16-0921, slip op. at 16. Although the majority limits this finding "going forward," the language of the statute has not changed. Further, in a 1994 letter, the OSC advised that the Judiciary Commission "expressed its **serious concern**" that the purchase of any insurance through the judicial expense fund "may violate the original intent of the judicial salary parity statute, R.S. 13:691." (Emphasis added.) The letter advised that life insurance with "cash surrender values" be "eliminated." Thus, the "serious concern" raised by the Judiciary Commission was not limited to cash surrender policies. See record of these proceedings at p. 3971.

5

principles enshrined in the Louisiana Constitution. This matter is solely before this court because the Judiciary Commission has recommended that Judge Derbigny be disciplined for misconduct. See La. Const. art. V, § 25(C) ("On recommendation of the judiciary commission, the supreme court may censure, suspend ..., remove from office, or retire involuntarily a judge for willful misconduct relating to his official duty, willful and persistent failure to perform his duty, persistent and public conduct prejudicial to the administration of justice ... ."). Once there is a finding of no ethical misconduct, in my view, there is no jurisdiction under La. Const. art. V, § 25(C), and the court is powerless to order reimbursement to the Judicial Expense Fund. See *Id.*; compare **In re Granier**, 04-3031, p. 4 (La. 6/29/05), 906 So.2d 417, 420. Cited by the majority to support the proposition that this court may order reimbursement,[7] in **In re Granier** this court publicly censured a judge for ethical misconduct and "further ordered that [the] Judge ... reimburse the Judicial Expense Fund of the 29th Judicial District Court $2,321.78." **In re Granier**, 04-3031 at 4, 906 So.2d at 420 (emphasis added). Stated simply, in the absence of ethical misconduct, there can be no order of reimbursement because, in the absence of ethical violation, this court lacks jurisdiction to impose an order of restitution. Yet, full reimbursement to the public fisc is absolutely necessary in this matter.

Ordering reimbursement for the sake of making the public fisc whole is only one reason why it is so important to properly evaluate ethical misconduct on the part of Judge Derbigny. It is well-established that the primary purpose of the Code of Judicial Conduct is the protection of the public rather than to simply discipline judges. **In re Best**, 15-2096, p. 15 (La. 6/29/16), 195 So.3d 460, 468 (citing **In re**

---

[7] See **In re Derbigny**, 16-0921, slip op. at 17 n.10.

**Marullo**, 96-2222, p. 6 (La. 4/8/97), 692 So.2d 1019, 1023).   A significant matter of public concern is the protection of the public fisc, as indicated by La. R.S. 13:691. See n.3, *supra*, quoting from La. R.S. 13:691(A) and (B)(3).

The Office of Special Counsel (the OSC), in my view, has clearly and convincingly established that Judge Derbigny violated La. R.S. 13:691 regarding other so-called employee benefits as found by the Judiciary Commission.   The record reflects that other court employees, who were not judges, could not access the supplemental insurance policies in the same large quantities and, hence, did not have benefits paid "at the same rate" as did Judge Derbigny.   See La. R.S. 13:691(A) and (B)(3).   The opinion tacitly concedes Judge Derbigny did not comply with the requirement for parity of benefits with non-judges set forth in La. R.S. 13:691, inasmuch as it finds Judge Derbigny selected supplemental insurance policies that were "duplicative."   **In re Derbigny**, 16-0921, slip op. at 14.   A recognition that Judge Derbigny accessed duplicative coverage undermines finding that the OSC has made no showing that the insurance premiums attributed to Judge Derbigny exceeded those of any other judges or state employees.   Under La. R.S. 13:691(A) and (B)(3), the questions to be answered are whether Judge Derbigny accessed benefits lawfully available to others and whether he accessed benefits at the same costs as non-judges.   Because he accessed benefits that were "duplicative," Judge Derbigny accessed benefits that were not lawfully available to others, or to himself; therefore, the costs for those benefits exceeded what others lawfully could impose on the public fisc.

Relatedly, I find the burden of proof placed on the OSC regarding the supplemental insurances is confounding, if not insurmountable.   It should not be the task of the OSC to ascertain whether other employees, judges or non-judges, are

7

unlawfully selecting more benefits than they are entitled to select. Implicit in finding there was "no showing" regarding others' selection of benefits is that if anyone else is selecting unauthorized or "duplicative" coverage, then no one has committed misconduct. Once the OSC established that Judge Derbigny was in violation of statutory law regarding insurance, it became his burden to establish any justification for taking advantage of the multiple policies.

This matter does not involve a failure by the Judiciary Commission to sustain its burden of proof. The most salient and relevant facts are not at issue. Rather this matter involves a determination of what law is to be applied to the facts and a determination of the appropriate sanction and amount of restitution. Those determinations are wholly within this court's jurisdiction.

Before discussing the appropriate sanction, I sum up my views on the conduct at issue and on the consequences for that conduct. I agree with the majority that Judge Derbigny should reimburse the Judicial Expense Fund for the out-of-pocket reimbursements under the Exec-U-Care program. However, I find that accessing the program was itself a violation of La. R.S. 13:691, and amounted to ethical misconduct. I would, therefore, require Judge Derbigny to also reimburse the Judicial Expense Fund for the amount spent for Judge Derbigny to participate in the Exec-U-Care program, which is the amount of reimbursement found by the Judiciary Commission. Furthermore, I would remand to the Judiciary Commission for a determination of the premiums paid by the Judicial Expense Fund for supplemental insurance policies that were in excess of what is permitted by La. R.S. 13:691, and I would order Judge Derbigny to refund the premiums paid on unauthorized policies. I would exclude from that litany of policies those that Judge Derbigny accessed when

8

he initially became a judge, except regarding any life insurance policies which are not authorized by La. R.S. 13:691.

Turning then to the sanction, I note that Judge Derbigny has previously received an admonishment from the Judiciary Commission for the late filing of a campaign finance report and the late payment of the related $2,500 fine. While I accept Judge Derbigny's representation that he was unaware he was committing any misconduct in the present case, his lack of intent to commit misconduct is no excuse. See, e.g., **In re Justice of the Peace Alfonso**, 07-0120, p. 7 (La. 5/22/07), 957 So.2d 121, 125 ("An act need not be intentional to support judicial discipline."). Finding some similarity between the conduct for which Judge Derbigny was previously admonished and the present misconduct–inasmuch as then and now Judge Derbigny has failed to fully inform himself and to responsibly discharge the administrative requirements attendant with holding judicial office–I believe that some period of actual suspension from judicial office is appropriate for these repetitive instances of misconduct. See, e.g., **In re Free**, 14-1828, p. 23 (La. 12/9/14), 158 So.3d 771, 784-85 (prior judicial discipline was appropriate to consider when imposing a suspension). At a bare minimum, the sanction of public censure recommended by the Judiciary Commission should be imposed.

I also agree with the Judiciary Commission's evaluation of mitigating factors. As summarized by the majority, Judge Derbigny's "conduct was significantly mitigated by the inaction of the Judicial [Counsel] and others who failed to properly advise the Criminal District Court judges about the legality of the supplemental benefits program." **In re Derbigny**, 16-0921, slip op. at 9. Moreover, "[t]he Commission agreed with Judge Derbigny that his level of culpability ... is greatly diminished by his lack of guidance from the judicial branch and by the actions of his

9

predecessors." *Id.*, 16-0921 at 16. I reiterate, however, that these are mitigating, not exculpatory factors.

I am not at all pressed to discern the reason for the Commission's reversal of its position in 1994. The Commission clearly determined that its 1994 opinion "that the judges had not engaged in any judicial misconduct by participating in the supplemental benefits program" was wrong and has presently corrected its stance.[8] Even then, the Judiciary Commission "expressed its strong concern that this practice [of accessing the Criminal District Court Judicial Expense Fund] may violate the original intent of the judicial salary parity statute." Thus, confronted in the present with misconduct that is significantly mitigated by a lack of administrative guidance, but is also aggravated by being related to Judge Derbigny's prior misconduct in administrative matters, I conclude that the suspension which should be imposed should be brief in duration.

As a final detail, I note that Louisiana Supreme Court Rule XXIII, § 22 provides for the recovery of costs incurred. Because it is Judge Derbigny's misconduct which provoked these extensive proceedings, and because the judicial salary parity statute violated here is intended to protect the public fisc, I would require Judge Derbigny to pay the costs of the proceedings.

Accordingly, I respectfully concur in part and dissent in part.[9]

---

[8] Commendably, in changing its course, the Commission has publicly taken the stance that it previously erred, and has staked a claim to the adage, that "two wrongs don't make a right."

[9] Whether my analysis, which concurs with the determination of the Judiciary Commission that discipline and restitution are warranted, or the alternative analysis, which absolves the judge of discipline and the obligation to reimburse the public fisc, is the "troubling" or "patently false" or "border[ing] on outrageous" analysis will ultimately be judged by those who evaluate these respective opinions in light of the record facts.

Similarly, others can evaluate whether my analysis, or the analysis which departs from the Judiciary Commission's recommendation and does not sanction this judge on these facts, is "patently unfair."

## SUPREME COURT OF LOUISIANA

### No. 2016-O-0921

### IN RE: JUDGE DARRYL A. DERBIGNY, ORLEANS PARISH CRIMINAL DISTRICT COURT, STATE OF LOUISIANA

### JUDICIARY COMMISSION OF LOUISIANA

**Guidry, J., dissents and assigns reasons.**

I respectfully dissent because in my view the record shows by clear and convincing evidence that Respondent committed ethical misconduct in accepting multiple supplemental benefits in violation of La. Rev. Stat. 13:691A and B(3). The sheer number of policies he accepted, along with their high cost, some with cash surrender values, and others with duplicative coverages, should have put Respondent on notice to investigate the propriety of the court's supplemental benefits program. Despite Respondent's reliance on the actions of other members of his court, as well as the complicated history of the supplemental benefits program, Respondent could have and should have discovered for himself that the language of the statute is clear that life insurance, especially those with a cash surrender value, and the reimbursement program known as Exec-U-Care were not permissible expenditures of the Orleans Criminal District Court Judicial Expense Fund. Thus, Respondent failed to maintain professional competence in the judicial administration of his court in violation of the Code of Judicial Conduct, Canon 3B(1) and violated La. Const. art. V, Sect. 25(C), because he engaged in persistent and public conduct prejudicial to the administration of justice that brought his judicial office into disrepute. I would accept the Commission's recommendation and impose a public censure on Respondent for his misconduct.

1

**SUPREME COURT OF LOUISIANA**

**No. 2016-O-0921**

**IN RE: JUDGE DARRYL A. DERBIGNY, ORLEANS PARISH CRIMINAL DISTRICT COURT, STATE OF LOUISIANA**

**JUDICIARY COMMISSION OF LOUISIANA**

**CLARK, J., concurs in the result.**

SUPREME COURT OF LOUISIANA

NO. 2016-O-0921

IN RE:  JUDGE DARRYL A. DERBIGNY, ORLEANS PARISH CRIMINAL
DISTRICT COURT, STATE OF LOUISIANA

JUDICIARY COMMISSION OF LOUISIANA

**HUGHES, J.**, dissenting.

There have been many failures illustrated by this case.  It is unfortunate that Judge Derbigny, at least at this point in time, should alone bear the brunt of these failures.  Yet the facts cannot be changed.  I would issue a public reprimand and order restitution.

## SUPREME COURT OF LOUISIANA

## NO. 2016-O-0921

## IN RE: JUDGE DARRYL A. DERBIGNY, ORLEANS PARISH CRIMINAL DISTRICT COURT, STATE OF LOUISIANA

## JUDICIARY COMMISSION OF LOUISIANA

**CRICHTON, J., concurring in part and dissenting in part:**

I concur in the plurality[1] opinion's finding that there has been no violation of the Code of Judicial Conduct in this case, and therefore, no sanction against Judge Derbigny is warranted. However, because this Court finds no ethical violation, I dissent from the plurality's conclusion that Judge Derbigny must reimburse the Judicial Expense Fund for the out-of-pocket reimbursements paid to him under the Exec-U-Care program. As Justice Weimer points out in his dissent, and with which I agree, this Court is divested of jurisdiction under La. Const. art. V, § 25(C) once there is a finding of no ethical misconduct, and consequently, the Court lacks authority to order reimbursement.

In bringing formal charges against Judge Derbigny in this case, the Judiciary Commission reversed the view it had held since 1994, previously having determined there was no judicial misconduct involving the purchase of insurance by the Orleans Parish Criminal District Court Judges. In so doing, the Judiciary Commission has now abruptly declared that by engaging in the routine administrative practices of Criminal District Court, Judge Derbigny engaged in persistent and public conduct prejudicial to the administration of justice. As the plurality thoroughly explains, we disagree.

---

[1] "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (internal quotations omitted).

1

Although the Commission may have found a violation by clear and convincing evidence, in my view, the Commission seems to have placed little weight on the 20- to 30-year routine practice of the Criminal District Court and its seemingly perfunctory administrative procedures. Not only did the Commission seem to overlook the historical practices of Criminal District Court, it also mistakenly placed little emphasis on the 1994 opinion of the Judiciary Commission (that there was no judicial misconduct involving the purchase of insurance for the judges); the 1994 legal opinion of the judges' counsel, Robert Murphy;[2] the complete inaction of the policy-making arm of the Louisiana Supreme Court, the Judicial Council; and the 2011 legal opinion of the judges' counsel, Normand Pizza (who also concluded the program was not an ethical violation). Moreover, while intent (whether specific or general) is noticeably not an element of a Code of Judicial Conduct violation, this Court must still examine Judge Derbigny's actions in light of the unique historical factors listed above. In doing so, I cannot under any circumstance conclude any violation of the Canons was proven by clear and convincing evidence (a considerably higher standard than that required in civil proceedings) in this case.

The implication by one of my dissenting colleagues that a majority of this Court is shirking its duty to protect the public is troubling. Clearly, it is a sacred tenor repeatedly recognized by this Court that the primary purpose of the Code of Judicial Conduct is to protect the public rather than to discipline a judge. *In re Marullo*, 96-2222, p. 6 (La. 4/8/97), 692 So.2d 1019, 1023. And, furthermore, this Court does not shy away from imposing discipline when the charges are, indeed,

---

[2] The dissenting justice states this Court places an "insurmountable burden of proof" on the Office of Special Counsel regarding the supplemental insurance. I respectfully disagree, as the Commission in 1994 concluded there was no ethical violation. Without a subsequent pronouncement by the Judiciary Commission or this Court during the span of time since 1994, I am confounded by the lack of due process and how the burden of proof can possibly be met.

2

proven by clear and convincing evidence.[3]    The implication by one of the dissenters in this case that we show leniency to judges who, by clear and convincing evidence, are proven to have violated the Judicial Canons is patently false and, in my opinion, borders on outrageous.

This Court is constitutionally vested with exclusive original jurisdiction in judicial disciplinary proceedings, an obligation we do not take lightly. We are also duty-bound to apply the appropriate burden of proof to the facts and evidence of each case without influence of public clamor or fear of criticism. While I likely would have taken a different course of action from that taken by Judge Derbigny and his Criminal District Court colleagues, I note such an observation is irrelevant in objectively determining whether a Canon violation has been proven by clear and convincing evidence. In my view, the Commission and one dissenting justice have incorrectly characterized the evidence presented in this case to be merely mitigation which, according to them, should only be considered after finding an actual ethical violation. While that principle stands true, it is also correct that the unique historical background evidence is relevant and directly bears on whether the prosecution has sustained its burden of proof as to the allegations of misconduct.

---

[3] This Court has removed judges in cases when the most serious conduct is proven by clear and convincing evidence. *See, e.g., In re Benge*, 09-1617 (La. 11/6/09), 24 So.3d 822, *reh'g den.*, 11/23/09 (judge removed from office for failing to decide a case on the evidence and testimony presented at trial); *In re Jefferson*, 99-1313 (La. 1/19/00), 753 So.2d 181, *reh'g den.*, 2/18/00 (judge removed from office for reckless and bad faith handling of contempt proceedings, unauthorized practice of law, and failure to cooperate with supernumerary judge); *In re Johnson*, 96-1866 (La. 11/25/96), 683 So.2d 1196, *reh'g den.* 12/13/96 (judge removed from office for continuation and management of business providing pay telephone service to inmates under contract with sheriff after he became a judge); *In re Huckaby*, 95-0041, (La. 5/22/95), 656 So.2d 292 (judge removed from office for failing to file federal income taxes).

This Court has also suspended or publicly censured judges when appropriate. *See, e.g., In re Best*, 15-2096 (La. 6/29/16), 195 So.3d 460 (judge suspended without pay for fifteen days for mishandling of a hearing to terminate probation); *In re Free*, 2016-0434 (La. 6/29/16), 100 So. 3d 571 (judge suspended without pay for one year for making ex parte comments about a pending case to a district attorney and the victims' families; improperly holding a defendant in contempt of court; and making inappropriate comments towards domestically abused women); *In re Sims*, 2014-2515 (La. 3/17/15), 159 So. 3d 1040 (judge suspended for thirty days without pay for improperly holding prosecutor in contempt and impermissibly dismissing fifteen criminal cases); *In re Whitaker*, 463 So.2d 1291 (La. 2/25/85) (judge suspended without pay for one year for smoking marijuana, associating with users and sellers of illegal drugs and with prostitutes, and association with an individual against whom criminal charges were pending).

As a result, I believe the evidence in the record before us results in a very unclear and unconvincing set of allegations. As the plurality opinion implicitly concludes, we do not reach the sanction mitigation phase because the alleged violations were not proven by clear and convincing evidence.

The Judiciary Commission has now spoken, reversing its original 1994 opinion, and this Court does not disagree with the Commission's change of course. Again, noting the Court's inherent and plenary authority over lawyer and judicial discipline matters and in accord with traditional notions of due process, I believe that prospectively, all judges are now placed on notice that any insurance or retirement-related benefits not specifically authorized by statute should not be paid for by parish or state funds. In sum, by recognizing the twin objectives of protecting the public, which includes our public fisc, and according our elected judges basic due process, we achieve justice deserved.